# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| RICKY J. LOPEZ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 3344 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Ricky Lopez applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§416(i), 423, about four and a half years ago. (Administrative Record (R.) 175-81). He claimed that he became disabled as of December 9, 2013, due to heart problems, hypertension, high cholesterol, and sleep apnea. (R. 203). Over the ensuing four years, Mr. Lopez's application was denied at every level of administrative review: initial, reconsideration, administrative law judge (ALJ), and appeals council. It is the ALJ's decision that is before the court for review. See 20 C.F.R. §§404.955; 404.981. Mr. Lopez filed suit under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c). Mr. Lopez asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

Mr. Lopez is 57 years old, and was 53 when his insured status expired in December 2014. (R. 267).[1] He has an exemplary work history, working steadily for over 30 years as a carpenter

---

[1] To qualify for DIB, a claimant must be disabled prior to the expiration of their insured status.
(continued...)

before his heart problems arose. (R. 193-94, 204). This was heavy, physical labor. (R. 65-67). He last tried to work for couple of months in 2013, but has not worked at all since December 2013. (R. 204).

Mr. Lopez has amassed a juggernaut of a medical record – over 1100 pages (R. 347-1503) – covering extensive treatment for his cardiac impairment, and additional treatment for his shoulder. That's not uncommon in these types of cases and, as is also not uncommon, not much of it is pertinent. The parties have isolated just 40 pages or so that are relevant to their positions here and to the review of the ALJ's opinion. [Dkt. #12]. Accordingly, we will dispense with a tedious summary and discuss only those doctor visits and medical findings that are pertinent.

After an administrative hearing – at which Mr. Lopez, represented by counsel, and a vocational expert testified – the ALJ determined he was not disabled. The ALJ found that Mr. Lopez had several severe impairments: "obesity, history of right rotator cuff tear post-surgical repair, obstructive sleep apnea, arrhythmia atrial fibrillation, congestive heart failure, aortic valve replacement." (R. 17). The ALJ dismissed other impairments that came up at various points in the medical record as non-severe, including hypertension, allergies, and right knee issues. (R. 18). Mr. Lopez's depression was non-severe as well, but did cause mild limitations in his abilities to understand, remember, and apply information; interact with others; maintain concentration, persistence, or pace; adapt or manage oneself. (R. 18-19). None of Mr. Lopez's impairments, singly or in combination, amounted to a condition that met or equaled an impairment assumed to be disabling in the Commissioner's listings. (R. 22-23).

---

[1](...continued)
*Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017).

The ALJ then determined that Mr. Lopez could perform "light work . . . except that [he] could occasionally climb ramps and stairs, but he could never climb ropes, ladders, or scaffolds. He could occasionally stoop, kneel, crouch, or crawl. He could never be exposed to unprotected heights, moving mechanical parts, or vibrations. He could not reach overhead on the dominant right side." (R. 20). The ALJ said that he found Mr. Lopez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." (R. 24). In addition to determining that the medical evidence was not consistent with Mr. Lopez's allegations, the ALJ also found that Mr. Lopez had not received the type of treatment one would expect from a totally disabled individual, that he was not compliant with treatment – he stopped taking his irregular heartbeat medication for a month in 2014, and his daily activities were not as limited as one would given his allegations of disabling symptoms. (R. 23). Specifically, the ALJ pointed out that he was able to manage his personal care, do some household chores, and accompany his wife when she shopped. (R. 24).

The ALJ then assessed the medical opinion evidence. She gave little weight to the opinion of Paul Peprich – a physical therapist – that Mr. Lopez had only an 11% impairment because it was couched in the terms of workers' compensation. (R. 23). The ALJ gave no weight to the opinion of Dr. Thometz that Mr. Lopez could not work as a carpenter because it pre-dated Mr. Lopez's alleged onset date and was an opinion reserved for the Commissioner. (R. 23). The ALJ gave great weight to the opinions of the doctors that reviewed the medical evidence on behalf of the Agency, because she found them consistent with the record as a whole. (R. 23).

3

Next, the ALJ found that Mr. Lopez was 52 years old when his insured status expired (R. 24) – he was actually 53 – and that made him an individual "closely approaching advanced age" under the Commissioner's regulations. (R. 24). He had less than a high school education and no transferable job skills. (R. 24). Given these vocational factors, Mr. Lopez would be found "not disabled" under the Medical Vocational Guidelines if he had the capacity to perform a full range of light work. (R. 24). As he did not, the ALJ relied on the testimony of a vocational expert who said that an individual with Mr. Lopez's restrictions could perform light work as a parking meter collector, a small product assembler, an usher (do they still exist?), or a housekeeper cleaner. (R. 25). As these jobs were claimed to exist in significant numbers in the national economy, the ALJ concluded that Mr. Lopez was not disabled before the expiration of his insured status was not entitled to DIB under the Act. (R. 25-26).

## II.

If the ALJ's decision is supported by substantial evidence, the court on judicial review must uphold that decision even if the court might have decided the case differently in the first instance. See 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Beardsley v. Colvin*, 758 F.3d 834, 836 (7th Cir. 2014). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Beardsley*, *Id.* at 837. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997);

4

*Schloesser v. Berryhill*, 870 F.3d 712, 717 (7th Cir. 2017)

But, in the Seventh Circuit, the ALJ also has an obligation to build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings. *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 618 (7th Cir.2010). The court has to be able to trace the path of the ALJ's reasoning from evidence to conclusion. *Minnick v. Colvin*, 775 F.3d 929, 938 (7th Cir. 2015); *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011). Even if the court agrees with the ultimate result, the case must be remanded if the ALJ fails in his or her obligation to build that logical bridge. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)(". . . we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").

### III.

#### A.

We begin with the ALJ's consideration of Mr. Lopez's fatigue and sleepiness during the day. At his administrative hearing, Mr. Lopez testified that his "sleeping is terrible" due to his sleep apnea. (R. 41). He wakes up often during the night and, as a result, falls asleep during the day. (R. 41). He took many naps or more accurately, would "just fall asleep during the day wherever [he was] sitting." (R. 41). He was "tired all the time." (R. 50). He would fall asleep while his wife made breakfast, while he tried to watch a TV show, or while his daughter talked to him. (R. 53). Finally, Mr. Lopez testified that he had "a lot of trouble staying focused," that it was hard to "stay concentrated", and that he never could finish anything. (R. 51-52).

Mr. Lopez's written statements were no different. He wrote that his sleep apnea caused him to sleep poorly at night and wake unrested. (R. 216, 252). Consequently, he had to nap during the day. (R. 217, 252). He complained several times about his daytime fatigue to his doctors, including several occasions in the year leading up to the expiration of his insured status. (R. 893, 999, 1016, 1190, 1449).

The ALJ didn't say much about Mr. Lopez's fatigue and sleepiness. She said there were no persistent claims in the medical record prior to the expiration of Mr. Lopez's insured status, but that's clearly not the case. She said that Mr. Lopez's "course of treatment was contained despite claims of fatigue," but it's not clear what to make of that. If she rejected Mr. Lopez's claims of daytime fatigue and sleepiness, she certainly wasn't clear about it; certainly not clear enough to build a logical bridge. *See, e.g., Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir.2009)(ALJ acknowledged the claimant's complaints of fatigue, but case remanded because "his analysis d[id] not articulate his reasons for rejecting them, except to say there [wa]s no objective medical evidence to support them."); *Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir.2013)("[i]f the ALJ disbelieved [the claimant], he needed to explain that finding in order to build a logical bridge between the evidence and his conclusion.")

In the end, however, the ALJ seemed to accept that Mr. Lopez suffered fatigue and sleepiness during the day because she said that her residual functional capacity finding was "sufficient to address claims of fatigue . . . ." (R. 22). One can only guess why that is. The ALJ's RFC finding certainly made no allowances for napping or even breaks during the day. *See, e.g., Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016) (need for frequent breaks is not consistent with light work activity). It made no allowances for loss of focus or concentration. One might suppose that when

6

the ALJ said she "address[ed] claims of fatigue" with her RFC, she meant the elimination of unprotected heights and moving mechanical parts. But, that would only be speculation. *Cf. Stroud v. Berryhill*, 2018 WL 4501674, at *6 (N.D. Ind. Sept. 19, 2018)(ALJ specifically stated that claimant's claims of fatigue were accommodated by restrictions against hazardous environments and limitation to simple, routine, and repetitive tasks). And, if that were the case, it would certainly scuttle the Commissioner's attempt to bolster the ALJ's reasoning after the fact.

The Commissioner explains that the ALJ relied upon the opinion of Dr. Gotanco, who reviewed Mr. Lopez's medical file in April 2015, and that opinion acknowledged and accounted for Mr. Lopez's complaints of fatigue. [Dkt. #14, at 13-14]. But Dr. Gotanco noted just a single occasion when Mr. Lopez said he was fatigued (R. 94), not the consistent complaints that the record reveals. And Dr. Gotanco didn't appear to impose any fatigue-related restrictions on Mr. Lopez's capacity for work, finding he would have no trouble working around dangerous machinery or heights (R. 94) – again, assuming those are the standard fatigue accommodations. As the ALJ imposed different restrictions on Mr. Lopez regarding machinery and heights – which, again, one can only assume was what she meant by accommodating Mr. Lopez's fatigue – and extreme temperatures, Dr. Gotanco clearly didn't attempt to accommodate Mr. Lopez's fatigue; or at least the ALJ didn't think so. And the ALJ certainly didn't incorporate Dr. Gotanco's conclusions into her RFC finding. Again, there is no way to know for sure what the ALJ exactly thought as she does not explain how her RFC took Mr. Lopez's sleepiness during the day into account. *See, e.g., Allensworth v. Colvin*, 814 F.3d 831, 835 (7th Cir. 2016)("The judge mentioned that she was restricting the plaintiff to simple work because of his sleep apnea, but did not explain why someone with hypersomnia should be able to stay awake at work just because it's simple work.").

7

Contrary to the Commissioner's protestations, it is certainly not the case that everyone who alleges fatigue is entitled to benefits unless the agency proves otherwise. But, the ALJ has to explain her decision, whether it's to reject claims of fatigue or to accept them and account for them – logically – in her RFC finding. *See, e.g., Allensworth*, 814 F.3d at 834 ("The plaintiff continued to insist that his hypersomnia was disabling and there is no contrary medical evidence."). As it stands, on the one hand, it appears the ALJ accepted Mr. Lopez's complaints of fatigue as she said she accounted for them in her RFC finding. On the other hand, there is no explanation of how that finding accommodates fatigue and sleepiness and, elsewhere in the opinion, the ALJ seems to question the credibility of such claims. (R. 22). As the Seventh Circuit pointed out in *Allensworth*, a person "cannot hold a full-time job if he is unable to stay awake for long periods of time or falls asleep unexpectedly." 814 F.3d at 833. The ALJ here failed to build an adequate logical bridge between the evidence – Mr. Lopez's daytime sleepiness and napping – and the conclusion that Mr. Lopez could perform light work on a regular basis throughout each day.

**B.**

That problem is enough reason for a remand of this case, but some further points are worth addressing. One is the ALJ's evaluation of "the intensity and persistence of [Mr. Lopez's] symptoms." SSR 16p–3; *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). As is the routine in these cases, the ALJ employed the following boilerplate in her assessment:

> . . . the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(R. 20). As the Commissioner seemingly concedes [Dkt. #14, at 9], this is a misstatement of the

applicable law, which requires that the ALJ determine whether a claimant's allegations "can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a); *see also Dunbar v. Berryhill*, 2018 WL 4095094, at *3 (N.D. Ill. Aug. 28, 2018); *Minger v. Berryhill*, 307 F. Supp. 3d 865, 871 (N.D. Ill. 2018).

But, as the Commissioner points out, elsewhere in her opinion, the ALJ referenced the correct standard, so perhaps she applied that one rather than the more rigorous one. The real question, as it has been fairly consistently for too long, is what is the point of including such meaningless or even incorrect boilerplate in opinions on a regular basis? *Cf. Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)("The government regards the 'template' as an indispensable aid to the Social Security Administration's overworked administrative law judges. Yet when we asked the government's lawyer at argument what the 'template' " means, he confessed he did not know."). All it does is raise questions about what an ALJ means and makes it more difficult to review an opinion. One is reminded of the Seventh Circuit's admonition in *Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006), that "[a]n advocate's job is to make it easy for the court to rule in his client's favor . . . ." An ALJ is not an advocate, of course, but surely they want their opinions upheld on review. Why not make it easier?

The ALJ did, at least, go on to give her reasons for discrediting Mr. Lopez's allegations. First, she stated that Mr. Lopez had "not generally received the type of medical treatment one would expect for a totally disabled individual before his Date Last Insured." (R. 23). This is a fairly common reason ALJs advance for disbelieving a claimant but, almost invariably, they do not explain what type of treatment they expect a disabled individual to have. *See, e.g., Voigt v. Colvin*, 781 F.3d 871, 877 (7th Cir. 2015); *Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013); *Eakin v. Astrue*, 432

9

Fed. App'x 607, 613 (7th Cir. 2011). That's certainly the case here, and the rationale is further undermined by the fact that Mr. Lopez has had *a lot* of treatment; remember, the record is an 1100-page juggernaut. Mr. Lopez has had an aortic valve replacement in July 2013 (R. 838), was subsequently treated for postoperative atrial fibrillation. (R. 717, 721). In February 2014, he was hospitalized for atrial flutter and rapid ventricular response, along with intraventricular block and left bundle branch block. (R. 505). After several more visits to his doctors for various cardiac issues, he underwent a cardioversion and catheter ablation in May 2014. (R. 1177). Symptoms resumed shortly thereafter, and Mr. Lopez underwent another ablation in September 2014. (R. 1041). What more the ALJ expected we don't know and she didn't say. But, even if she had, she is not qualified to determine an appropriate level of cardiac treatment for Mr. Lopez. *See, e.g, Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009)("The ALJ impermissibly 'played doctor' and reached his own independent medical conclusion when he determined that '[t]he level of treatment received also fails to infer limitations beyond the limitations described above in this decision.'").[2]

Next, the ALJ noted that Mr. Lopez went off one of his medications, Amariodone, for a month in May 2014. (R. 23). At that time, he was taking Xarelto, Lisinopril, Atorvastatin, and Pantoprazole. (R. 662). But, we don't know why he stopped taking Amariodone for that brief period. Mr. Lopez did testified that he suffered side effects from some of his medications (R. 49-50), but the ALJ never asked why he stopped taking Amariodone. The ALJ was required to inquire into why Mr. Lopez did not keep up with this particular medication and consider his explanation. *Myles*,

---

[2] One could imagine, of course, a case where a claimant has had little or no medical treatment in which an ALJ made a similar judgment about the level of treatment not being commensurate with disability and it might be acceptable and logical. But, again, this is a case with hundreds of pages of medical records and multiple cardiac interventions.

10

*Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009).

Finally, the ALJ also found that Mr. Lopez described daily activities which were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. (R. 23-24). Again, as with her assessment of Mr. Lopez's treatment, the ALJ fails to explain what her expectations are. Mr. Lopez's daily activities are extremely limited:

> Well, I try to get up at 8:00, and that's a good day. I go, I'll sit in the living room, maybe have a little breakfast. My wife will have my stuff ready, and kind of fall asleep on the couch or in a recliner, try to watch a show or something, and talk to my daughter a little bit maybe, and I'll fall asleep. And we'll have dinner, and wait until my wife gets home, we'll have dinner. And it's just, I don't do much, I don't talk to any friends anymore, I just don't do much, it's, you know, socializing or anything like that . . . .

(R. 53). That seems entirely consistent with a claim of disability, so the ALJ really needed to explain herself on this point. We know she was impressed with Mr. Lopez's ability to "perform some household chores" (R. 24), but the statement the ALJ cites says only that he put dishes in a dishwasher a couple of times a week. (R. 253). The ALJ noted that Mr. Lopez could manage his personal care (R. 24) but, again, that's not much and, significantly, Mr. Lopez reported that often had to be reminded to do so by his family. (R. 253). That leaves "accompany[ing] his wife while shopping, (R. 24). Overall, it's not much activity at all. The ALJ seemingly ignored the uncontradicted evidence that Mr. Lopez's activities were few and severely restricted. *See, e.g., Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). To say that the foregoing activities are inconsistent with being disabled makes no sense; there is no logical bridge here to explain how it does.

Notably, not even the Commissioner could explain this, saying only, "it was not unreasonable

for the ALJ" to reach the conclusion that sitting on a couch or recliner all day and sporadically drifting off to sleep was inconsistent with a claim of disability. [Dkt. #10, at 9]. That's nothing more than an unadorned, and illogical *ipse dixit* offered in support of another unadorned and illogical *ipse dixit*. "[U]nfortunately" – even for ALJs – merely "saying so doesn't make it so...." *United States v. 5443 Suffield Terrace, Skokie, Ill.,* 607 F.3d 504, 510 (7th Cir.2010). The *ipse dixit* approach is hopelessly at odds with the logical bridge requirement. *See* the discussion in *King v. Berryhill*, 2018 WL 6179092, *3 (N.D.Ill. 2018).

Finally, while the ALJ was noting the foregoing factors, she never bothered to considered Mr. Lopez's solid work history. Nor did she take into consideration his attempt – ill-advised – to return to his past work. It's just one factor, and certainly not dispositive, but a consistent work history weighs in favor of a positive credibility finding. *Summers v. Berryhill*, 864 F.3d 523, 529 (7th Cir. 2017); *Cullinan v. Berryhill*, 878 F.3d 598, 604 (7th Cir. 2017)("A positive work history makes a claimant more credible."). "[A]nd a desire to resume work similarly makes a claimant more credible, not less." *Cullinan*, *supra*.

Beyond that, it is worth addressing Mr. Lopez's argument that the ALJ failed to properly consider the opinion of one of Mr. Lopez's treating doctors, Dr. Thometz. [Dkt. # 11, at 2]. Dr. Thometz treated Mr. Lopez's right shoulder impairment and, in February of 2011 stated that Mr. Lopez could not reach overhead with his right arm or lift more than 15 to 20 pounds to waist level. (R. 1211). The ALJ rejected the opinion because it predated the date Mr. Lopez claimed he became disabled: December or 2013 and because "the opinion of whether a claimant is disabled is reserved for the Commissioner." (R. 23).

The ALJ's former rationale – that the opinion came long before Mr. Lopez claimed he was

12

disabled – is valid. What Mr. Lopez could do in February 2011 and what he could do after December 2013 might have very little to do with one another. Mr. Lopez argues that *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984) requires that the ALJ consider an opinion from nearly three years before Mr. Lopez even claims he became disabled. [Dkt. # 11, at 5]. It does not. In fact, the case only says that evidence *post-dating* the expiration of a claimant's insured status is relevant to her condition prior to that time.

On the other hand, the ALJ's latter rationale has been rejected by the Seventh Circuit over and over, *see, e.g., also Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012), most recently in *Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018):

> Whether a claimant qualifies for benefits is a question of law, but a medical opinion that a claimant is unable to work is not an improper legal conclusion. Indeed, ALJs must consider medical opinions about a patient's ability to work full time because they are relevant to the RFC determination.

*Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018)(citations omitted); *see also Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013)(". . . [t]he answer to the question [of whether an individual is disabled for the purpose of receiving benefits] depends on the applicant's physical and mental ability to work full time, and that is something to which medical testimony is relevant and if presented can't be ignored."). In other words, a doctor flatly stating a patient is disabled doesn't take into account the full range of considerations that go into determining whether that person is entitled to disability benefits. A doctor doesn't know what jobs exist or what they demand, for example. But Dr. Thometz didn't make a flat statement that Mr. Lopez was disabled. He gave a medical assessment of Mr. Lopez's capabilities. *See, e.g., Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013)(ALJ must

consider opinions from medical sources in determining the claimant's residual functional capacity).

In the end, however, the quarrel about Dr. Thometz's opinion is much ado about little. True, he felt Mr. Lopez couldn't lift his right arm overhead or lift more than 15 to 20 pounds in February 2011 and had reached maximum medical improvement. (R. 1211). But, the ALJ also found Mr. Lopez couldn't lift his right arm overhead, and could lift no more than 20 pounds and carry not more than 10. (R. 20). A couple of years later, in July 2013, Dr. Thometz opined that Mr. Lopez was unable to return to his work as a carpenter. (R. 1208). The ALJ found the same thing. (R. 24). As such, the game might not have been worth the candle.

Then, there is the vocational evidence. The vocational expert testified that, if one accepts the ALJ's RFC finding, Mr. Lopez could perform work as a parking meter collector, a small product assembler, an usher, or a housekeeper cleaner, and that these jobs exist in significant numbers in the national economy. (R. 25, 68). This testimony was based on, or drawn from, the Dictionary of Occupational Titles. (R. 69). But, as the Seventh Circuit has pointed out more than once, the DOT provides no estimate of the number of jobs in the economy at each position. *Chavez v. Berryhill*, 895 F.3d 962, 965 (7th Cir. 2018); *Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014). The vocational expert in this case may have consulted the Department of Labor's compilation of Occupational Employment Statistics and worked from there, but even that method is questionable, *see Chavez*, 895 F.3d at 965, 969-70, and we don't know for sure because "the vocational expert did not explain where he got the job numbers from." *Allensworth*, 814 F.3d at 836.

Some of these types of issues really should jump out at an ALJ. For example, one of the jobs listed was parking meter coin collector. There can be no doubt that coin parking meters are

14

becoming scarce, but perhaps there are still 60,000 of these jobs around. Any confidence in that figure or really, that the job still exists, is certainly undermined by the fact that the DOT entry for the job – "coin-machine collector" – has not been updated *in thirty years*. https://occupationalinfo.org/29/292687010.html. Not long ago, the Seventh Circuit made it clear "[t]he DOT is 'obsolete'" and an "ALJ's reference to the DOT gives this court little confidence that [a claimant] could perform the jobs the ALJ identified." *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018). It's not as apparent that there are "numbers problems" with the other jobs listed but, along these lines, "cleaner, housekeeping" was last updated in 1986, "usher" was last updated in 1981, https://occupationalinfo.org/34/344677014.html, and "assembler, small products" was last updated in 1979. https://occupationalinfo.org/70/706684022.html.

This final entry brings us back to the beginning. Recall there is a problem with Mr. Lopez's fatigue and sleepiness during the day. "Assembler, small products" requires the worker to attend machines or keep pace with other workers in an assembly line. https://occupationalinfo.org/70/706684022.html. That's going to be difficult for someone who can't maintain attention due to sleepiness and drifts off on occasion. Moreover, the entry indicates that the fourth most frequent element of the job, rated as 70 out of 100, is exposure to hazardous equipment. https://occupationalinfo.org/onet/93956.html. That seemingly contradicts the ALJ's restriction against work involving "moving mechanical parts." (R. 20). Of course, that still leaves the usher and cleaner jobs – at least as they were performed circa 1980 – for a supposed total of 145,000 positions, if those estimates are valid – which is highly unlikely. Overall, the vocational evidence in this case does not inspire confidence!

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion to Reverse the Decision of the Commissioner [Dkt. #11] is GRANTED, and the ALJ's decision is remanded to the Commissioner for further proceedings. The defendant's motion [Dkt. # 13] for an affirmance of the ALJ's decision is DENIED.[3]

ENTERED: /s/ Jeffrey Cole
UNITED STATES MAGISTRATE JUDGE

**DATE:** 12/3/18

---

[3] Two additional points need be made. First, while the plaintiff filed a "Memorandum in Support of His Motion to Reverse the Decision of the Commissioner of Social Security", he never actually filed any such motion. And, second, Mr. Lopez asks that the ALJ's decision be reversed and an award of benefits ordered. "It remains true that an award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." *Allord v. Astrue*, 631 F.3d 411, 417 (7th Cir. 2011). As the remand here comes under the Seventh Circuit's "logical bridge" requirement, an award of benefits is not appropriate without further administrative proceedings.